The final case of the day is McNair v. United States. Mr. Cortezar. Thank you, Your Honor, and may it please the Court. After years of trying, Tyrus McNair obtained a vacator of the Indiana conviction that served to enhance his federal sentence. In this appeal of the District Court's dismissal of his resentencing motion, I wish to address the following three points. First that the District Court had jurisdiction to hear Mr. McNair's motion. Second that the issue of due diligence is a factual matter that is entrusted to the defendant for first consideration there, and third that the inclusion of the predicate sentence in his federal sentence was not a harmless error. Panetti and Quarterman establishes that an inmate can bring a newly ripened claim in a second-in-time petition so long as that claim was not ripe at the time of his first-in-time petition. The government and Mr. McNair both appear to agree on this point, but where they disagree is in what the meaning of ripeness is under Panetti. Mr. McNair, it's a fairly straightforward application. Ripeness is the traditional rule of ripeness that a claim is not ripe until all the predicate events necessary to establish that claim have, in fact, occurred. This Court's decision in Purvis establishes that the vacator is itself the ripening event. The government, however, would split Panetti and ripeness doctrine in two. On one side would be what the government calls genuinely unripe claims, which would be brought under Panetti, and on the other side is what the government might term only technically unripe claims. But the government does not provide a clear distinction between these two concepts, and what it does provide has to be inadequate. The way I understand it is that what the government is arguing is that in order to bring a genuinely unripe claim, the dividing line is whether or not an inmate knew some bundle of facts that would eventually coalesce at the time of ripeness. But that cannot be the case, because if you look at Panetti itself, the inmate in that case knew almost all of the predicate facts that would eventually coalesce into his foreclaim. He knew, for example, that he suffered from severe schizophrenia, and that he had suffered from it since 1981. He knew, or should have known, that the conditions of confinement were likely to exacerbate his schizophrenia. And in his first-in-time petition, he, in fact, brought claims of mental incompetence to stand trial and mental incompetence to waive counsel. He did not, however, bring a claim of mental incompetence to be executed under Ford. But under the government's argument, he should have. He should have, and he should have pursued Ryans v. Weber. But the Supreme Court did not hold that against Mr. Panetti. In fact, the Supreme Court criticized the Ryans v. Weber pathway. It called it an empty formality in claims where ripeness is not destined to occur. And that's exactly the case here. I think at this point, it also helps to look a little bit more at how courts would have to adjudicate unripe Johnson claims under both Panetti and under Cunliffe. Can I pause you there, Mr. Cortazar, before you pivot and go further on that point? Suppose you're right, you know, that the way you've read the case law and strung it together here is correct. Don't we still have to find that this petition is timely under F-4? And I know you're saying, well, no, you don't. You know, you should remand if the court would ever get that far. It's not proper for this court. That's more traditionally done and more properly done in the district court. I understand that argument just fine. It does seem to me, though, that we've got a really long timeline of events here in front of us. And the thing that I can't understand at all in thinking about F-4, not the first issue, the F-4 issue, is why it took Mr. McNair from 2003 until 2007, you know, to start pressing the Indiana courts for this relief. And then, so we have that period of delay, and I'm thinking about that in light of that qualifier in Johnson. And then on top of that, we have, I don't know the exact number, but 8, 9, 10 years, you know, between the 06, 07 to the 17 period, where I think he's saying I couldn't afford to go to Indiana court. Correct. So that's, all of those facts are what concern me for Mr. McNair here. Okay. So before turning to the property, to the propriety of considering that as a matter of first instance here, I'll just take your question head-on. I think that Mr. McNair suffered from some confusion as to the nature of his claim. It kind of had a dual deficiency. And one claim, it was illegal under Indiana law because for a Class III felony, he could only get, I think, up to 30 or 60 days. But instead, he had gotten half a year. So that was wrong. But there was another deficiency, which was that he had not been, he had not intelligently waived counsel for this claim. And under a suspended sentence, I'm not Alabama versus Shelby, he ultimately won in 17, right? Maybe on one or both of those bases, but what is he doing between 03 and 07? I mean, he, this is definitely an individual that knows how to file legal papers. Right. He's filing many legal papers in federal court. I believe under the, under the assumption. Over and over and over again. But he's doing nothing in Indiana. Right. And I think what he's, what he was doing is he was filing it in this court under the assumption that he could bring it under Alabama versus Shelton as a direct challenge. I think that when he did, he, when he did finally understand the distinction between a federal court and a state court, and he brought it in 2007, he was kicked out because he didn't have the funds to bring that court. And around that same time is also when he was sanctioned by the district court, $500 for constantly bringing the same claim over and over and over again. And I think that having that, that strain on his finances, being in Minnesota while his family and friends were all in Indiana, having to coordinate that, having to get counsel and having to find the money after he paid back his fine to file in Indiana was a significant strain on his ability to do so. And I think that the case law in this circuit actually recognizes that even though Mr. McNair took sometimes eight years to file a claim, that there's this gap, that that's not necessarily indicative of a lack of diligence. Now Johnson, the inmate had a one-year gap, but the inmate had not pleaded any facts of due diligence. He had no excuse. If you look at the Supreme Court's decision, he really gave no explanation for why he had not filed it. And the Supreme Court, again, was in that case merely affirming the district court. The line of argument that you've been pursuing in response to my colleague's question brings to mind equitable tolling, but I don't understand your brief as making any such argument. Have I misread it? No, it's not equitable tolling. It's the nature of due diligence under the 2255 and under Ed Fund. And under that, it's reasonable, it's the reasonable efforts that an inmate has made. And I think that in that case, this inmate has made... So no diligence at all is due diligence because, well, inmates aren't lawyers. No, that's not the case. I think in Johnson, of course, it says that you cannot assume that... You still have to assume a certain reasonable level of competence. But at the same time, it does recognize, and this court has recognized the special constraints of confinement, as well as the fact that things can be happening outside of the courtroom that are not... That can also play into diligence. And I think that's what happened in Dalton v. Battaglia where you had an eight-year gap between the conviction and the... Between the conviction and the first petition in state court. And what the court had said was that the inmate and his mother were working together during this period to try to bring the claim. They waited eight years, but during that period, they were actually trying to collect their documents. They were not relatively sophisticated, and it took them a while to get that, to plead in that case, which was merely the issue that he was not of right mind at the time that he pled guilty. But at that time, you would think that he should have filed at that point because he would have known at that moment he was not completely in his right mind when he pleaded guilty. That's not a fact that he necessarily needed to go back and forth with the Indiana courts for. And I see that at this point, I'm into my rebuttal time, so I'd like to reserve the remainder. Certainly, counsel. Mr. Whalen. May it please the court. Good morning, Your Honors. Nathaniel Whalen here on behalf of the United States of America. This court has already rejected the argument Mr. McNary raises today that petitioners like him are not filing second or successive 2255s. In Unthink, the petitioner, like Mr. McNair, had a state court, I'm sorry, a sentence federally, filed the 2255, it was denied. Like Mr. McNair, he filed multiple 2255s or post-conviction proceedings after that. Like Mr. McNair, Mr. Unthink then sought to vacate a state judgment, and then like Mr. McNair, he sought a 2255 with the district court for re-sensing. This court said that that is a second or successive 2255 for which he needs authorization. He didn't have it, Mr. McNair doesn't have it, this court's decided the issue against him. I understand Mr. McNair might not like the Unthink decision, he might think this court ignored Supreme Court precedent at the time that it issued that decision. It is a binding decision that Judge Lee, down below, was bound by, and it is a decision that this court has held. The 11th Circuit itself noted it was creating a split with this court because Unthink found that this is a second or successive 2255. Where do you see the language that expressed in Unthink? I mean, the Unthink, the only reason I'm asking that is Unthink goes through the 2255 H1 and H2, you know, very demanding exceptions, limitations on bringing a second or successive. But I didn't read Unthink as coming right out and saying, finding, determining, you know, we have a second or successive in front of us. Which of course we did not, because Unthink dealt with a petition under 2241. Right, and Mr. Unthink's argument was that he couldn't bring his. So in light of what Judge Easterbrook, so how is Unthink dispositive on the question? Unthink decided that he couldn't bring his motion as a second or successive 2255, and that's what triggered his argument about the Savings Clause. Is Obeyed consistent or inconsistent with Unthink? Your Honor, I'm sorry, Your Honor, what did you say? Obeyed, consistent or inconsistent with Unthink, as you read it. As we read it, Obeyed deals with a different type of claim, Your Honor. I think this court's drawn a distinction between the Johnson type claims they were dealing with here and the type of claim that Mr. Obeyed would have brought. Obeyed, as Your Honor's probably aware of, and as Judge Lee noted, didn't address Unthink expressly. Obeyed dealt with Purvis. Purvis, in turn, looked at this type of claim, and it said the stay and obey procedure is really the better way to handle this. And there's a logical and intuitive appeal for that, because the stay and obey procedure is going to dovetail with the diligence question under F4. A petitioner, like Mr. McNair, is probably going to have about nine months between his 12 months as right, verse 2255, and that gets us to the 21 months the Supreme Court says is too much for the due diligence question. And so a petitioner, like Mr. McNair, is going to be able to bring this claim in his first 2255 if he avails himself of the stay and obey procedure that this court talked about in Purvis, and that this court in Obeyed did reference and said Purvis concluded the stay and obey procedure is the better way to deal with this. It's in parenthetical in the Obeyed decision. It came back to your question, Judge Scudder, about the exact language in UNTHINK. What I would point to is it's on pin sites 535 and 36. If Mr. UNTHINK wanted to use 2255 to argue for a lower sentence after asking the state court to vacate one or more of his convictions, he only had to refrain from filing a collateral attack until the state court acted. He may have unwisely used that one 2255 allowed as a right, but he did use it in 1998 and has not met the statutory requirements for an additional round of collateral review. That's the language we're relying on, Your Honor. And he did file. I mean, you're right to say there was a first 2255 there. I mean, I get it. But Your Honors, I think to the extent that Mr. McNair is asking this court to overturn precedent and circulate an opinion, I'd suggest that this isn't necessarily the case to do it for the reasons Your Honors have identified. There's a serious due diligence gap that Mr. McNair has not alleged facts even that allow him to, he can't show diligence based on the facts he's alleged. And it's our position that the district court wouldn't even have to have an evidentiary hearing on this case, except every one of his facts is true and he cannot meet the due diligence standard for the reasons Judge Scudder asked about. I think, you know, that first four-year period, and we have on page 23 of our brief, we tried to catalog all the actions he's taken. He has four years between the federal judgment and his first motion in state court. He alleges he basically didn't understand what he was doing, and that's why he started attacking it federally. The Supreme Court says that's not an acceptable reason under the diligence standard. In fact, the district court in the sentencing memo told him, listen, I have the federal court. I can't address your state court conviction. When it rejected his argument that his criminal history overrepresented his seriousness of his criminal history. Mr. Whalen, are you, do you think you are encouraging a system where defendants bring in 2255 claims loaded with every possible injustice they can possibly think of, and then the district courts have to wade through page after page of unrighted claims and just stay any that are not yet right? Wasn't the whole point of the ADPA to reduce waste of judicial resources? Yes, Your Honor, that was the whole point of the ADPA, and Your Honor, my colleagues at the trial level who deal with the 2255s would be very upset if I advocated this court to have defendants bring the kitchen sink approach, but that's not what we're advocating here. And the judges would be upset. The judges also would be very upset, Your Honor, and we certainly don't want to upset them. What we're dealing with here is we're dealing with a special type of claim, and it's the claim that my state court conviction is invalid, and it's a claim that petitioners like McNair know at the time of the federal sentencing. Mr. McNair objected on the same basis that ultimately he obtained the vacator 13 years, 13 and a half years later. So it might be different if a defendant isn't aware of the facts that ultimately will produce the vacator. That's not Mr. McNair's case. In terms of, I understand Mr. McNair's made kind of a floodgates argument, and I understand lawyers love making these arguments. I am prone to it on occasion, too, Your Honor. I think if you look at this court's interpretation of this Supreme Court Johnson case, not the other Johnson case, if you look at this Johnson case, I think between Mr. McNair and the government, we've identified all of this court's cases dealing with this type of claim, and there are maybe four or five. This just isn't a common occurrence. If you look at the federal courts of appeals across the board, there really aren't that many cases that deal with a petitioner who gets a state court conviction vacated. And so there isn't going to be a floodgate. There isn't going to be thousands of petitioners. There aren't going to be floodgates. Forget about floodgates and slippery slopes. Forget about all the Seventh Circuit cases, right? Let's not think for the moment about how obeyed and unthanked go together. Suppose you just evaluate this under the Supreme Court's cases, like Panetti against Quarterman. How does it come out? I think were we dealing on a fresh slate, Your Honor, this court might be inclined to— I don't know what you mean by a fresh slate. Just ignore decisions of the Seventh Circuit and tell me how you think it comes out under decisions of the Supreme Court. Your Honor, I think under decisions of the Supreme Court, there is a very strong argument that the Panetti approach is the right approach. There's a strong argument that the Panetti approach is the right approach when you're dealing with these claims. I think Judge Lee himself recognized that down below. But Judge Lee, as are the other district courts in this circuit— Well, look, if a district judge thinks he's got a conflict between the Supreme Court and the Seventh Circuit, which one is he supposed to follow? He's supposed to follow the Supreme Court, Your Honor. Exactly. If you're out of line with the Supreme Court, you follow the Supreme Court. So if your understanding is that McNair wins under Panetti, why are you urging the district court to follow the Seventh Circuit rather than the Supreme Court? Because Your Honor, this court dealt with Panetti in the Purvis case, and this court said that Panetti isn't the right analysis. That's why we're arguing that. The district court is bound by this court's precedent No, it's bound by the Supreme Court's precedent. unless the Supreme Court abrogates or somehow overrules that precedent. No, no, no, no. It is bound by the Supreme Court's precedents unless the Supreme Court overrules them. It is not bound by the Supreme Court's precedents unless the Seventh Circuit overrules them. I misspoke, Your Honor. I misspoke. The district court is bound by the Seventh Circuit precedent unless the Supreme Court abrogates or overrules that precedent. So you think we can overrule the Supreme Court, oblige the district court to ignore the Supreme Court for years and years and years until it finally says, oh, what a bunch of dopes. No, Your Honor. No, it's supposed to follow the Supreme Court all the time. Correct. Just as this court is supposed to. And this court in Pervis dealt with Panetti and it looked at the Eleventh Circuit case law that adopted the argument of Mr. Panetti. Let me tell you my problem. It just seems to me that it's messy to have a rule where courts have to figure out what a petitioner knew or did not know at the time of the first 2255 petition. I mean, let's take a Mr. Panetti. Should he have anticipated that his mental health might decline given his prior history? No. I mean, you know, should Mr. Obeyed have considered that the government might go back on its oral assurance? How can a court evaluate what facts were known to a particular defendant at the time of the first 2255 petition with certainty? Well, in this case, all you have to do is go back to the sentencing transcript, Your Honor, and Mr. McNair's objections to the PSR. And he knows the facts that ultimately resulted in the vacater. This isn't that type of case, Your Honor, where the district court doesn't have any clue what the defendant knew at the time of either sentencing or his first 2255. Your Honor, as I see, I'm past my time. Unless this court has any further questions, we would ask that you affirm or otherwise dismiss as untimely. Thank you. Thank you. Anything further, Mr. Cortazar? Just a few points. The government's right that there aren't many published cases in this type of issue, but what they're looking at is the top of the iceberg and not what's below. These decisions are not appealable unless there's a certificate of appealability. And there are many reasons that a district court might decide not to issue an opinion on, or a published opinion on this type of matter. But that does not mean that it's not a burden on district courts that have to apply a difficult three-part test that in many ways will be a dress rehearsal for a show that might not even exist, that might not even be produced. If you look at whether or not the prongs, whether or not a claim is potentially meritorious, that goes to the merits. And if you look at whether or not an inmate was dilatory, that goes to the 2255F problem. But again, I want to emphasize in closing that this court has never decided the issue of due diligence under AEDPA as a matter of first instance. And if you color match this case against cases from district judges who have experience dealing with these cases all the time, there actually are cases throughout the country in the Eastern District of California, in the District of Massachusetts, and the Southern District of Florida that have found due diligence is satisfied even when an inmate knocks on the wrong door because Williams v. Taylor establishes that it's reasonable efforts, not legal acuity that matters for purposes of diligence. Thank you. Thank you. And Mr. Cortazar, we appreciate your willingness to take the appointment and your assistance to the court as well as your client. Case is taken under advisement and the court will be in recess.